Filed 8/12/22  In re Christopher M. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re CHRISTOPHER M., a Person Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTOPHER M., <br><br> Defendant and Appellant. | B313002 <br><br> (Los Angeles County Super. Ct. No. DK23650) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Juvenile Court Referee. Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant Christopher M.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Christopher M. appeals from the juvenile court's order under Welfare and Institutions Code section 366.26 terminating his parental rights to his son, C.M., who is now five years old.[1] He argues the juvenile court erred in ruling the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i), did not apply. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Juvenile Court Detains C.M., Sustains a Petition, and Removes C.M. from His Parents*

Michele W., who is not a party to this appeal, gave birth to C.M. in April 2017. When the hospital was ready to discharge C.M. from the neonatal intensive care unit, a hospital social worker told the Los Angeles County Department of Children and Family Services that the hospital was concerned about C.M.'s safety because he was medically fragile and Michele did not appear healthy enough to care for him. In addition, Michele and Christopher appeared to be under the influence of a substance.

---

[1]     Statutory references are to the Welfare and Institutions Code.

The next day Michele was admitted to the hospital and tested positive for methamphetamine.

The family agreed that the hospital would release C.M. to a maternal aunt and that Michele and Christopher would take drug tests. On April 19, 2017 Christopher tested positive for methamphetamine and amphetamine. On May 10, 2017 the juvenile court issued a removal warrant, and the Department placed C.M. in a foster home.

The Department filed a petition under section 300, subdivision (b)(1), alleging in counts b-1 and b-2 that Michele's and Christopher's substance abuse placed C.M. at risk of serious physical harm.[2] At the May 17, 2017 detention hearing the juvenile court found Christopher was C.M.'s presumed father and detained C.M. from Michele and Christopher. The court ordered that Michele and Christopher could have two-hour monitored visits at least three times a week.

At the July 26, 2017 combined jurisdiction and disposition hearing the court sustained the counts against Michele and Christopher and declared C.M. a dependent child of the court under section 300. The court removed C.M. from Michele and Christopher and ordered the Department to provide reunification services.

---

[2] The petition also included counts alleging that Christopher failed to ensure C.M.'s older half-sibling regularly participated in mental health counseling and failed to obtain psychotropic medication for the half-sibling, that Christopher's mental and emotional problems rendered him incapable of providing regular care and supervision for C.M., and that Christopher medically neglected C.M.'s half-sibling. The juvenile court dismissed these counts at the jurisdiction hearing.

B.  *Michele and Christopher Fail To Reunify with C.M., and the Court Terminates Their Parental Rights*

At a May 23, 2018 review hearing the foster mother and social worker reported that monitored visits between July 2017 and January 2018 went well and that Michele and Christopher acted appropriately, but that during a visit in February 2018 Christopher was under the influence of drugs and was unable to spend time with C.M. Christopher tested positive for methamphetamine five times between August and November 2017 and twice in January 2018, and he missed two drug tests in February 2018. In a last minute information report, the Department stated that Michele continued to visit C.M. weekly, but that Christopher was not visiting or making himself available to the Department. The court terminated Christopher's reunification services but continued them for Michele. The court subsequently placed C.M. with his maternal aunt, terminated Michele's reunification services, and set the matter for a selection and implementation hearing under section 366.26.[3]

At the selection and implementation hearing under section 366.26 on May 17 and 18, 2021, counsel for Christopher argued terminating Christopher's parental rights would be detrimental to C.M. because it would deprive him of "the positive emotional attachment he has" with his father. The court found that, although there had been "regular and consistent visitation," the visits did not create "a parental relationship between the minor

---

[3]  Christopher filed petitions under section 388 in June 2019 and September 2019. The court denied both petitions without a hearing. Michele filed a petition under section 388 in July 2019, which the court denied after an evidentiary hearing in August 2019.

4

and the parents" sufficient to establish "the exceptional circumstances where a parental bond can be claimed." The court stated that the visits amounted to "play dates" where "no significant parenting" occurred and that Christopher, unlike Michele, was generally "a passive participant." The court also stated that C.M. was four years old (at the time) and had never lived with his parents, that Michele and Christopher had "never graduated from anything other than monitored contact," and that C.M. saw his caregivers as his primary parental support. Finally, the court stated Christopher was not familiar with the extensive services C.M. required and had not attended any of C.M.'s appointments for one to two years. The court terminated Michele's and Christopher's parental rights and designated C.M.'s maternal aunt and uncle as the prospective adoptive parents. Christopher timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

The purpose of a section 366.26 hearing is "'to select and implement a permanent plan for the child'" after reunification services have been terminated. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*); see *In re D.M.* (2021) 71 Cal.App.5th 261, 268 (*D.M.*).) If the court determines "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26,

subd. (c)(1)(B), (4)(A).)  One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child."  (*Caden C.,* at p. 629; see § 366.26, subd. (c)(1)(B)(i); *D.M.,* at p. 268.)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'"  (*Caden C., supra,* 11 Cal.5th at p. 632; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151.)

To establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Caden C., supra,* 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 852.)  The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'"  (*Caden C.,* at p. 632; see *J.D.,* at p. 854.)  In assessing the attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents."  (*Caden C.,* at p. 632; see *J.D.,* at p. 854.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citations.]  Because terminating parental rights eliminates any legal basis for the

6

parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra,* 11 Cal.5th at p. 633; see *In re A.L., supra,* 73 Cal.App.5th at p. 1151.)

A "substantial evidence standard of review applies to the first two elements." (*Caden C., supra,* 11 Cal.5th at p. 639; see *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206.) Regarding the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision . . . is discretionary and properly reviewed for abuse of discretion." (*Caden C.,* at p. 640; see *L.A.-O.,* at p. 206.)

B. *The Juvenile Court Did Not Abuse Its Discretion in Finding the Parental-benefit Exception Did Not Apply*

Christopher argues that, although "[f]or the most part" the juvenile court's "observations were not incorrect," the court "misunderstood and misapplied" the parental-benefit exception by considering factors the Supreme Court deemed improper in *Caden C.,* decided nine days after the juvenile court terminated Christopher's parental rights. It is true the juvenile court's ruling was not entirely consistent with *Caden C.* For example, the court's statements that "there has to be a parental relationship between the minor and the parents" and that "there is no significant parenting that goes on during the visitation" may run counter to the Supreme Court's admonitions in *Caden C.* that "courts must remain mindful that rarely do '[p]arent-child

7

relationships' conform to an entirely consistent pattern" and that "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Similarly, the court's comments Christopher was "unable to describe with any detail [C.M.'s] extensive services" and "did not attempt to engage in any of those services or appointments" suggest the court may have improperly compared Christopher's attributes as a custodial caregiver to those of the prospective adoptive parents. (See *id.* at p. 634 [juvenile court should not "compar[e] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"]; *In re D.M.*, *supra*, 71 Cal.App.5th at p. 270 [the Supreme Court in *Caden C.* "made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like"]; *ibid.* [juvenile court erred in focusing on whether the father attended medical appointments and understood his children's medical needs rather than on the attachment between the children and their father].)[4]

But any inconsistency between the juvenile court's evaluation of Christopher and C.M.'s relationship and the Supreme Court's soon-to-be-issued decision in *Caden C.* was

---

[4] Christopher also asserts that under *Caden C.* his "failure to prove or maintain sobriety is not a bar to the beneficial relationship exception." Also true. But although counsel for the Department mentioned Christopher's substance abuse during the section 366.26 hearing, the juvenile court did not, and there is no indication it was a factor in the court's decision.

harmless because Christopher did not present any evidence that terminating the relationship "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) Christopher points to evidence that his visits with C.M. generally went well, that Christopher acted appropriately, that C.M. was happy and excited to see Christopher, and that C.M. referred to Christopher as "daddy." There was also evidence that Christopher brought C.M. clothes, food, and diapers; that he hugged and kissed C.M. and played with him; and that he encouraged C.M. to say his "ABCs" and learn how to identify colors and shapes. Christopher argues this evidence showed C.M. "was positively attached" to him.

Some of the evidence suggested Cristopher was attached to his son (although there was not much evidence suggesting C.M. was attached to his father). But there was no evidence that terminating the relationship, however positive that relationship might be, would be detrimental to C.M. Although C.M. enjoyed his parents' visits, there was no evidence he looked forward to them or had trouble separating. In fact, the evidence was that C.M. was more bonded to Michele than to Christopher. During one visit in September 2019, C.M. "appeared to be excited to see his mother," but when Christopher "attempted to greet" his son, C.M. "did not greet or acknowledge him." When Christopher tried to push C.M. on a toy, C.M. "became upset and did not want father to push him." In October 2019 the monitor described C.M.'s interaction with Christopher as "minimal" and "standoffish." The monitor observed that C.M. "does not cry or appear sad when the visit ends." Even Christopher testified that the last time C.M. appeared sad toward the end of a visit was

before the COVID-19 pandemic began in March 2020. When virtual visits began in 2020, Christopher usually sat behind Michele and engaged with C.M. less than she did.

In short, whatever relationship C.M. had with Christopher, there was no evidence whether severing that relationship would be harmful to C.M., how C.M. would be affected by losing that relationship, or what life would be like for C.M. without Christopher in his life. (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re A.L.*, *supra*, 73 Cal.App.5th at pp. 1158-1159 [though the child viewed the father as "'a fun, friendly person' to have visits with," the child "had no difficulty separating from father at the end of visits" and "was easily redirected when father had missed scheduled video visits"]; compare *In re D.M.*, *supra*, 71 Cal.App.5th at p. 271 [children had lived with their father for two to eight years, wanted to return to him, and cried when visits with him concluded]; *In re J.D.*, *supra*, 69 Cal.App.5th at pp. 857-858 [child frequently expressed a desire to go to his mother's house, told her he loved her, and sought her attention during visits]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229 & fn. 4 [children looked forward to seeing their parents, greeted them with hugs, and expressed sadness at the end of visits].) Nor does Christopher argue there was any such evidence. Indeed, the evidence showed severing the relationship between Christopher and C.M. would not cause C.M. any detriment at all.

In contrast, the evidence C.M. would benefit from adoption by his foster parents was significant. C.M. had lived with his foster parents for nearly three of his four years and, as the juvenile court found, C.M. saw them as "his primary parental support, the ones that he goes to for comfort, the ones that he goes to for his needs and who have been meeting his needs." The

Department reported C.M. displayed "affection towards the caregivers" and referred to his foster mother as "mommy." (See *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1158 [child "told social workers that she was very happy living with the caregivers," called them "'mommy,' 'mom,' 'dad,' and 'daddy,'" and said "she loved them"].) On this record, any error in the juvenile court's ruling on what is now the second step of the *Caden C.* analysis was harmless.

## DISPOSITION

The juvenile court's order terminating Christopher's parental rights is affirmed.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.

11